ESTATE OF MILLIE LANGLEY WRIGHT, DECEASED, JEANNETTE WRIGHT TORNEY, ADMINISTRATRIX, WITH THE WILL ANNEXED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 99579. Promulgated February 11, 1941.

*Edward J. Torney, Esq., Darwin Bryan, Esq., Richard E. Doyle, Jr., Esq.,* and *Myrtile Cerf, C. P. A.,* for the petitioner.
*T. M. Mather, Esq.,* for the respondent.

552

554

## OPINION.

OPPER: Our findings of fact dispose of the first issue by the ultimate determination that the property in question was transferred in contemplation of death. We have arrived at that result because of our belief that petitioner has failed to produce convincing evidence that decedent's compelling motive was associated with life rather than death. The transfers were made shortly after decedent's will was executed and disposed of her property similarly and to the natural objects of her bounty. *Rengsdorff* v. *McLaughlin* (Dist. Ct., N. Dist. Calif., S. D.), 21 Fed. (2d) 177; *Travelers Bank & Trust Co., Executor*, 29 B. T. A. 88. Decedent was at the time suffering from the physical infirmity which later carried her off.[1] She had been confined to the hospital for some time, earlier in the same year in which the gifts were made, and had hardly dismissed the attendant employed following that illness before the death of her brother resulted in what is described as a "mental upset." Even if her physician did not warn her, and there is no evidence that he did not, it is hardly probable that the sequence of events could have failed to impress upon her the seriousness of her condition. See *Travelers Bank & Trust Co., Executor, supra; Rebecca Luscomb et al., Executors*, 9 B. T. A. 1070; affd. (C. C. A., 2d Cir.), 30 Fed. (2d) 818. She was again striken a few months after the execution of the will and the transfer of the property and death occurred about six months later.

The only suggestion of a motive not describable as contemplation of death is testimony to the effect that decedent expressed a desire to relieve the financial distress of one of her two daughters. But this condition is shown to have been of long standing and no effort is made to account for the bestowal of so large and unusual a generosity at that particular time. Moreover, although only the pecuniary straits of one of the daughters is shown, the gift was made equally to both. And, while decedent was evidently in the habit of making comparatively small contributions to both of her daughters from time to

---

[1] The cause of death and length of last illness, as given on the estate tax return, was "Arterio-sclerosis and myo-carditis Approximately 18 months."

time, this one was many times larger than anything that had been given to the daughter in question on any previous occasion. It was quite the opposite, therefore, of a mere continuation of decedent's previous practice. *Wendell W. Fish et al., Executors*, 27 B. T. A. 1002; affd. (App. D. C.), 75 Fed. (2d) 769. Taking the evidence as a whole, we remain unconvinced that the transfers were not made in contemplation of death. The respondent must, therefore, be sustained.

The second issue involves the valuation for estate tax purposes of preferred and common shares of McKesson & Robbins, Inc. Although the provision of the statute[2] which we are here required to apply uses the single word "value", it is apparently agreed by both parties that its meaning is "fair market value." *Ithaca Trust Co. v. United States*, 279 U. S. 151. And such is the purport of respondent's regulations. Regulations 80, art. 10 (a).

The stock in question was traded on the New York Stock Exchange and there is no dispute that respondent's valuation is proper if, under the circumstances, such quotations are the appropriate measure of fair market value. Petitioner, however, advances the apparently novel[3] contention that these prices were the result of misrepresentations and concealments of which purchasers and sellers on the Exchange were at that time unaware. For this reason we are urged to find a value for the stock entirely independent of the figures at which it was actually bought and sold during the critical period.

If we were seeking to fix a fair value, rather than a market value which is fair, such considerations would not be without appeal. Cf. *Boyd v. Wyly*, 124 U. S. 98, 106; *Buck v. Commissioner* (C. C. A., 9th Cir.), 83 Fed. (2d) 786. That this stock, however, had a market value is conceded, and it must be further recognized that the very shares owned by this estate could have been sold at the quoted prices. Indeed, the only market prices shown are those employed by respondent. Petitioner insists that the market value could not have been fair if based upon general misconception as to the underlying facts. But this goes beyond what we conceive to be the significance of the aspect of fairness as it modifies the existence of market value. It may be that a showing of general market prices is not a demonstration of the fair market value of a particular block of stock where it can be shown that general conditions or those affecting particularly the sales which have actually transpired do not "fairly" reflect the circumstances surrounding the specific property to be valued. Such

[2] Sec. 302, Revenue Act of 1926.
[3] The only case relied on as a precedent is one construing a California statute, *In re Spitly's Estate*, 124 Cal. App. 642; 13 Pac. (2d) 385.

a thought is expressed in *Heiner* v. *Crosby* (C. C. A., 3d Cir.), 24 Fed. (2d) 191, a case cited by petitioner, as follows:

* * * Sales are always evidence of a market price, but the statute requires that, in "ascertaining the gain derived from the sale," there must be not simply a "market price," but a "fair market price". * * * Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value * * *.

Of this the familiar "blockage" rule is another example. *Estate of Leonard B. McKitterick*, 42 B. T. A. 130.

But here there was nothing "peculiar" or "unusual" about either the actual transactions on the Exchange or the situation in which the estate found itself. Its securities could have been sold, and would have been had they been offered, under identical circumstances and at a comparable price with all of the stock which actually was traded in. What petitioner's position would require us to hold, therefore, is that a universally accepted market price, the result of numerous transactions in which the general public freely participated, should be disregarded because more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed. This does not prove that the market did not exist or that the sales did not take place. Nor does it show that they did not fairly evaluate petitioner's stock at the time. We think it unnecessary to proceed so far in applying the phrase "fair market value." And the administrative and judicial difficulties which would be involved in the adoption of any different rule convince us that petitioner's position is untenable. If it were always necessary to discover whether every material fact was known to the public before stock exchange prices could be relied upon in fixing fair market value, and indeed to determine what factors are and what are not material in the operations of the whole body of the trading public, it would, we think, be impossible for administrative officers or taxpayers to make an intelligent approximation of their own situation. Nothing in the position of petitioner or others similarly situated requires any such result.

If, in fact, our determination were to be affected by equitable considerations, we think the same result would be required.[4] Suppose, for example, that petitioner had actually sold the securities within

---

[4] See Hughes, Federal Death Taxes, p. 270:

"* * * If a farmer died leaving valuable farm lands, and oil, which was unknown to exist on it at the time of his death, should be subsequently discovered, that could not be used to increase the known value at the time of his death. Similarly, if at the time of a taxpayer's death, the quoted market prices were at a depression low, it would be as logical for the Treasury to claim that they were not fair prices as it would be for a taxpayer to claim that inflated quotations were not fair prices."

a reasonable time after her decedent's death. Assuming a very much lower "true" value for the stock at the date of death, would petitioner be liable for the staggering capital gain which would then result from the difference between the actual market and the valuation adopted for estate tax purposes? And would this be so, even though, as would then be the fact, the actual market was unchanged between the two dates? We think it could never have been intended that an article which could fairly and honestly be sold on an open and public market at a price reasonably constant for a long period of time should be given a different value by reason of any such circumstances as those shown here to exist. See *Estate of Leonard B. McKitterick, supra.* Respondent's determination is approved.

On the final issue it is shown that petitioner has become obligated for attorneys' fees and other expenses in connection with the settlement of the estate. There is no countervailing proof on behalf of respondent. Petitioner is sustained on this point. *Otis Weld Richardson et al., Executors,* 1 B. T. A. 1196.

*Decision will be entered under Rule 50.*