**Miriam SAKOL, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 355, Docket 77–4143.**

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1978.

Decided April 6, 1978.

Burton G. Lipsky, New York City (Delson & Gordon, New York City, of counsel), for appellant.

William A. Friedlander, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before FEINBERG and OAKES, Circuit Judges, and WYATT, District Judge.*

OAKES, Circuit Judge:

Is it constitutional under the Fifth and Sixteenth Amendments for Congress, in taxing a corporate employee in connection with his purchase of his employer's stock, not to take into account any diminution in value of the stock that may be present by virtue of temporary restrictions on transfer in the employer's underlying stock purchase plan? Section 83(a) of the Internal Revenue Code governs the taxation of certain stock transfers to employees "in connection with the performance of services."[1] It re-

---

* Of the Southern District of New York, sitting by designation.

[1] Section 83(a), which is not confined to transfers of stock, provides:

Property transferred in connection with performance of services

(a) General rule.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject

quires a taxpayer to include in gross income the excess of the stock's fair market value over its cost, as soon as the taxpayer's interest is no longer subject to a substantial risk of forfeiture. The actual value of the stock arguably may be less than the value of stock readily transferable on the open market because of restrictions imposed by the stock purchase plan. Nevertheless, these restrictions, other than permanent, nonlapsing restrictions, may not be considered in determining fair market value. Appellant argues that the Tax Court erroneously concluded that the statute was constitutional under the Fifth and Sixteenth Amendments. 67 T.C. 986 (Mar. 23, 1977). We disagree, and accordingly affirm the Tax Court.

## I. FACTS AND PROCEEDINGS BELOW

During 1972, taxpayer was employed by Chesebrough-Pond's Inc. (Chesebrough). Chesebrough offered to its officers and administrative employees a stock purchase plan under a standard stock purchase agreement. The agreement, executed by all purchasers, provided that one dollar par value common stock could be purchased for an amount equal to fourteen times Chesebrough's average per share earnings during the preceding five years. It also contained a restriction on transfer referred to below.

On May 7, 1971, taxpayer agreed to purchase 140 shares at $21.20 per share. For a period of one year thereafter, her shares were subject to forfeiture if she ceased to be employed by Chesebrough for any reason other than death.[2] In addition, she was bound not to sell, pledge or transfer any interest in the shares for a five-year period ending May 7, 1976.[3] The transfer restriction, however, could be waived by Chesebrough.

As of May 7, 1972, taxpayer's 140 shares were no longer subject to forfeiture. Thus, the excess of the stock's fair market value over its cost became includable in taxpayer's gross income in the 1972 tax year.[4] On the last business day prior to May 7, the average New York Stock Exchange quotation for Chesebrough stock was $66.50 per share. Taxpayer's required inclusion under the statute, therefore, is measured by the difference between her cost of $21.20 and the market price of $66.50, or $45.30 per share for a total of $6,342. Because taxpayer both included the $6,342 in gross income and then deducted that amount in arriving at her adjusted gross income, the Commissioner determined a deficiency. It was in a redetermination petition that taxpayer challenged the constitutionality of Section 83(a).

## II. DISCUSSION

### A. *The Fifth Amendment Ground*

Appellant rests her Fifth Amendment argument on the irrebuttable presumption doctrine.[5] She contends that the conclusive

to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.
26 U.S.C. § 83(a).

2. The shares were forfeitable at a price equal to that paid by her.

3. Chesebrough was willing to retain the shares for safekeeping until expiration of the five-year restriction period. Shares delivered were to bear a legend noting the transferability restrictions.

4. *See* note 1 & accompanying text *supra*. Under 26 U.S.C. §§ 421–25, transfers of stock to an employee exercising a "qualified stock op-

tion," *id.* § 422, an option under a qualified "employee stock purchase plan," *id.* § 423, and certain "grandfathered" restricted stock options, *id.* § 424, receive more favorable tax treatment than permitted by Section 83(a).

5. *See, e. g., Vlandis v. Kline*, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973) (conclusive presumption of nonresidence held unconstitutional since the presumption "is not necessarily or universally true in fact, and . . . the State has reasonable alternative means of making the crucial determination"); *Crawford v. Cushman*, 531 F.2d 1114, 1124–26 (2d Cir. 1976) (mandatory discharge from Marine Corps for pregnancy violates equal protection and creates an unconstitutional irrebuttable presumption in violation of the Due Process clause). For one critique of the doctrine, see

legislative generalization embodied in Section 83(a) violates the Due Process clause because the statute imposes a tax on an amount, "which . . . does not, and cannot be made to, exist in actuality . . ." *Heiner v. Donnan,* 285 U.S. 312, 329, 52 S.Ct. 358, 362, 76 L.Ed. 772 (1932).[6]

The doctrinal underpinning for taxpayer's argument flowered in the early 1970's when the dormant irrebuttable presumption doctrine was revived in constitutional analysis. *See, e. g., Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (holding unconstitutional a conclusive presumption of nonresidence whenever a person applied to a Connecticut state university from out of state); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (invalidating local education board rules requiring pregnant teachers to take maternity leave without pay a specified number of months before and after the expected birth of her child).[7] Earlier, *Heiner* with the aid of this analysis, had held unconstitutional a federal statutory presumption that gifts made within two years of a donor's death were made in contemplation of death.[8]

More recently, however, the Court has narrowed the broad scope of the irrebuttable presumption doctrine [9] evinced in *Vlan-dis* and progeny. *See* note 7 *supra.* For example, *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), upheld a federal statute precluding widows and their children from receiving Social Security survivors' benefits unless the claimant's relationship to the wage-earner existed at least nine months before his death. The Court articulated a rational relationship test for testing the validity of conclusive legislative presumptions in the context of a "noncontractual claim to receive funds from the public treasury," *id.* at 772, 95 S.Ct. at 2470:

> The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Id.* at 777, 95 S.Ct. at 2473. The extent of the *Weinberger v. Salfi* limitation on the scope of the irrebuttable presumption doctrine was apparently clarified in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). *Turner Elkhorn* validated a federal law utilizing

---

Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534, 1544–56 (1974).

**6.** To illustrate the point, counsel for taxpayer at oral argument suggested hypothetically that the restrictions on the stock reduced its value from $66.50 per share to perhaps $45.00 per share. Thus, taxpayer argued, she should have included in her return only the difference between the value as depreciated by the restrictions and her cost.

**7.** *See also United States Dep't of Agriculture v. Murry,* 413 U.S. 508, 514, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) (provision of Food Stamp Act denying eligibility to a household which has a member 18 years or older who is claimed as a federal income tax dependent by a taxpayer who is not a member of an eligible household held unconstitutional); *Stanley v. Illinois,* 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (statute presuming that unmarried fathers are unfit to take custody of their children upon mother's death is unconstitutional); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (statute providing that an uninsured motorist involved in an accident loses his license without a hearing pending a final determination of liability held unconstitutional).

**8.** In addition to relying specifically on *Heiner v. Donnan,* 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), the Court in *Vlandis v. Kline, supra,* 412 U.S. at 446, 93 S.Ct. 2230, also cited *Schlesinger v. Wisconsin,* 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926), holding unconstitutional a *state* statute which conclusively presumed that gifts made within six years of the donor's death were made in contemplation of death.

**9.** This development was perhaps presaged in *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 377, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (upholding constitutionality of truth-in-lending rules requiring disclosure when installment purchase provides for four or more payments).

two irrebuttable presumptions: a miner "afflicted with complicated pneumoconiosis is [conclusively deemed] to be totally disabled due to pneumoconiosis; if he has died, it is [also] irrebuttably presumed that he was totally disabled by pneumoconiosis at the time of his death, and that his death was due to pneumoconiosis." *Id.* at 11, 96 S.Ct. at 2890. The Court sustained this potentially overinclusive legislative determination on the basis that Congress is ordinarily accorded great leeway in "regulating purely economic matters." *Id.* at 23–24, 96 S.Ct. 2882. And it emphasized that conclusive presumptions in economic matters cannot be "equat[ed]" with presumptions "in the mold of *Stanley* and *Vlandis*." *Id.* at 22, 96 S.Ct. at 2895.

■ While it is difficult to reconcile all of the Supreme Court's pronouncements on the irrebuttable presumption doctrine [10] it seems that in the wake of *Turner Elkhorn* and *Salfi* "purely economic matters" will not be subject to the demanding test of *Vlandis v. Kline, see* note 5 *supra,* but rather will be governed by *Turner Elkhorn's* more deferential standard of review.[11] That is to say congressional judgments in the form of "irrebuttable presumptions" in the economic area will be upheld where there is a rational relationship between the criteria set forth in the statutory mandate and a legitimate congressional purpose. *See Goldberg v. Weinberger,* 546 F.2d 477,

480 (2d Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977) (rational relationship test appropriate for due process and equal protection challenge to Social Security law denying certain benefits to widows who remarry before reaching age 60); *cf. Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1202–03 (2d Cir. 1977) (rational relationship test appropriate for equal protection challenge to economic regulation).

■ Applying, then, the rational relationship test to Section 83(a), we note and the taxpayer concedes, Brief for Appellant at 19, that Congress could legitimately have judged that the law prior to the enactment of Section 83 permitted undue income tax avoidance through the use of restricted stock options. The value received by the employee was not taken into income until the restrictions lapsed,[12] yet such arrangements generally permitted taxpayers to enjoy the voting and dividend benefits of stock ownership, despite restrictions on transfer. Section 83(a), which entered the Internal Revenue Code as part of the Tax Reform Act of 1969,[13] was a congressional attempt to eliminate such tax avoidance, clearly a legitimate governmental purpose. While taxpayer takes exception to the possibly overbroad means utilized to effectuate the congressional purpose, the statutory scheme [14] satisfies constitutional standards of rationality for three reasons.

10. Professor Tribe has carefully detailed the problems in reconciling the various irrebuttable presumption decisions of the High Court. *See* L. Tribe, *American Constitutional Law* § 16–32, 1095–96 & n. 25 (1978). But we are as satisfied as he that the early tax cases, *Heiner v. Donnan, supra,* and *Schlesinger v. Wisconsin, supra,* although cited with approval in *Vlandis v. Kline, supra,* 412 U.S. at 446, 93 S.Ct. 2230, are "plainly not good law today." L. Tribe, *supra,* at 1095 n. 25. They can no longer withstand analysis in the light of *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and *Mourning v. Family Publications Serv., Inc., supra.*

11. *Cf.* Tribe, *Structural Due Process,* 10 Harv. C.R.–C.L.L.Rev. 269, 310–14 (1975) (individualized inquiry more fitting where fundamental rights are involved).

12. In addition to deferring taxation, prior law operated to convert ordinary income into capital gain. Moreover, the capital gain was long-term since the holding period commenced at the time of acquisition of the restricted stock. *See* Mertens, *Federal Income Taxation,* Code Commentary § 83, at 98 (Malone ed. 1971).

13. Section 83(a) was added to the Code by Section 321(a) of the Tax Reform Act of 1969, Pub.L. 91–172, 83 Stat. 487, 588 (1969).

14. The method adopted to deal with what was essentially a timing problem has two facets: delaying the time of recognition until no substantial risk of forfeiture remains, while ignoring any value-depressing effect of transfer restrictions. *See* note 1 *supra*; notes 21–22 *infra.*

First, whatever depreciating effect transfer restrictions may have on stock value adversely affects only the taxpayer-employee who wishes to sell his stock during the restriction period and is denied the right to do so by the corporation. Prior to enactment of Section 83 most of these restrictions were cooperatively imposed by the corporation with the aim of providing a tax benefit to the employee rather than advancing purely corporate objectives. Section 83(a) is a reasonably well tailored means of defeating a device the only business purpose of which could be to pay employees with dollars that, because they may be tax-free or tax-favored, may be fewer. Second, the corporation always retains, expressly or by implication of law, the power to waive any restriction. The waiver power thus renders the amount of value depreciation both speculative and dependent upon the subjective intentions of the parties to the plan. Congress was therefore justified in adopting nonindividualistic means, *see* note 11 *supra*, because the factual determinations otherwise necessary accurately to value the shares would depend upon matters entirely within the knowledge and control of the corporate employer and its employee. Since a corporation such as Chesebrough could always release its employee from the restrictions, determining share value with any degree of certainty would be most difficult, expensive and, to the tax collector, administratively inordinately inconvenient. *See Mathews v. Lucas*, 427 U.S. 495, 509–10, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). Finally, it is not insignificant that those who choose to participate in a restricted stock option purchase plan do so voluntarily, presumably aware of Section 83(a)'s tax consequences. That taxpayers participate in such plans with open eyes minimizes the arbitrariness which flows from the lack of perfect fit between the congressional means and its purpose.

Section 83(a) creates a blanket rule, to be sure, unfair perhaps in an individual case, that transfer restrictions generally are to be given no effect in computing the Section 83(a) inclusion. We nevertheless find the requisite rational relationship between congressional means and the legitimate congressional purpose in curbing tax avoidance from the use of restricted stock options. The statutory scheme does not exhibit the kind of "extreme and glaring" disregard of "fair dealing," *Cohan v. Commissioner*, 39 F.2d 540, 545 (2d Cir. 1930), which amounts to confiscation, rather than taxation, in violation of the Fifth Amendment.

## B. The Sixteenth Amendment Ground

Taxpayer's second contention is premised on the Sixteenth Amendment [15] and the well-known, but often distinguished, decision in *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920). That case, the only Supreme Court decision ever to hold an income tax provision unconstitutional on Sixteenth Amendment grounds, concluded that Congress had no power to tax stock dividends as income without apportionment. Taxpayer urges *Eisner's* applicability because her tax liability was computed on the basis of the value of freely transferable stock, an amount in excess of the actual fair market value of her restricted stock. *See* note 6 & accompanying text *supra*. She suggests that Section 83(a) imposes an unapportioned direct tax on property because it is a tax on unrealized income. We are unable to accept this proposition.

The tax here levied was not a direct tax on property but was rather a tax on the receipt of value transferred to an employee by an employer in return for services. It was, therefore, a tax on income received as compensation for services. Thus, if appellant's position were that a direct tax on property is implicated because her compensation was in the form of stock, the argument would be plainly off base. Tax on compensation, whether received in cash or some other form of property, need not be apportioned. *See Springer v. United*

---

**15.** "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S.Const. amend. XVI.

*States*, 102 U.S. 586, 602, 26 L.Ed. 253 (1880); *Penn Mutual Indemnity Co. v. Commissioner*, 32 T.C. 653, 659–66 (1959) (en banc), *aff'd*, 277 F.2d 16 (3d Cir. 1960).

However, appellant's real argument appears to be that she should be taxed only on the compensation she actually received—the value of the stock with the restrictions. Relying on the language of *Eisner*, she urges that income must in fact be realized before it can be taxed, and that the realization requirement carries with it the additional implication that an amount greater than value actually derived is not income within the meaning of the Sixteenth Amendment. But the *Eisner* concept that there must be "gain" to have "income," *Eisner v. Macomber, supra*, 252 U.S. at 207, 40 S.Ct. 189, has been modified by subsequent decisions. Among these are decisions accepting the accrual method of accounting,[16] adopting the doctrine of constructive receipt,[17] and disallowing the shifting of taxation burdens by assignment of income or by certain transfers in trust.[18] These decisions recognize that concepts of income are dynamic, not static—elastic, not rigid. 1 Mertens, *Federal Income Taxation* § 5.03, at 4–8 (Malone ed. 1974).

We conclude that a workable, practical system [19] of taxing employees' restricted stock options can overlook, at least temporarily,[20] a speculative decrease in value in ascertaining the amount of compensation received in the form of restricted stock where the employee has obtained both voting power and dividend rights. Absent the statute, some stock restrictions might in the abstract make determination of a fair market value exceedingly difficult or downright impossible. *See Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 499, 57 S.Ct. 569, 81 L.Ed. 755 (1937). By the statute, Congress has drawn a decisive line between restrictions which either defer taxation [21] or by their own terms affect the fair market value calculation [22] and those restrictions which are not considered in measuring fair market value. Congress is not required to take each and every restriction into account in combating tax-avoidance, or to make equally difficult individual evaluations which depend upon the parties' subjective intentions. Rather, the Sixteenth, and Fifth, Amendments permit the line drawn to be a rough one, in the interest of realistically solving a practical problem, by making a "gross accommodation to the economic reality." *Fraser v. Commissioner*, 25 F.2d 653, 655 (2d Cir. 1928) (L. Hand, *J.*). Congress has

---

**16.** *E. g., Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 364–66, 51 S.Ct. 150, 75 L.Ed. 383 (1931) (Sixteenth Amendment permits accrual method); *Aluminum Castings Co. v. Routzahn*, 282 U.S. 92, 97, 51 S.Ct. 11, 75 L.Ed. 234 (1930) (accrual method "born of necessity").

**17.** *E. g., Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930) (grantor taxable on transfer in trust where he retains right to alter, amend or revoke trust).

**18.** *E. g., Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940) (assignment of income); *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940) (grantor taxable on income of five-year trust even though income was payable to his wife, since grantor retained sufficient incidents of ownership).

**19.** *See, e. g., Burnet v. Sanford & Brooks Co., supra*, 282 U.S. at 365, 51 S.Ct. 150; *Farmers Loan & Trust Co. v. Minnesota*, 280 U.S. 204, 212, 50 S.Ct. 98, 74 L.Ed. 371 (1930).

**20.** Because her basis for the acquisition of the stock will be its Section 83(a) value, if she sells it for less she will be entitled at least to capital

loss treatment. In the end, then, Section 83 relates principally to the timing of taxation rather than to what is being taxed.

**21.** Until the employee's ownership interest is not subject to a substantial risk of forfeiture, there is no taxation under Section 83(a). *See* note 1 *supra.*

**22.** Restrictions that will never lapse are taken into account in determining fair market value. *See* note 1 *supra.* Thus, where the stock may be sold only at book value or at a value fixed by formula, if the restriction will never lapse, that formula-determined value is deemed to be the fair market value unless the Commissioner proves the contrary. 26 U.S.C. § 83(d)(1). "In such a case," runs the legislative rationale, "the restriction is an inherent limitation on the recipient's property rights, and his income should be determined accordingly." S.Rep.No. 91–552, 91st Cong., 1st Sess. 121 *reprinted in* [1969] U.S.Code Cong. & Admin. News, pp. 2027, 2153.

distinguished qualified from nonqualified stock option plans and in connection with the latter it has drawn a sharp line of differentiation on the basis of forfeiture and a rough one on the basis of value. Because nonqualified plans have been the vehicles of tax avoidance Congress may clothe the tax incidental to them with a ready-made, rather than a custom-tailored, suit.

Judgment affirmed. No costs.