THEODORE M. HORWITH AND HAZEL M. HORWITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1528–76.     Filed February 28, 1979.

*William R. Nicholas* and *Robert E. Bennett, Jr.,* for the petitioners.

*James D. Vandever,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1971 and 1972 in the respective amounts of $1,371 and $12,400. Concessions having been made, the only issue remaining for our decision is whether petitioners properly valued certain stock received by them in 1972 for purposes of computing income under section 83(a)(1), I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, the additional stipulation of facts, and the exhibits attached to them are incorporated by this reference.

Petitioners Theodore M. Horwith (hereinafter petitioner) and Hazel M. Horwith filed their joint Federal income tax returns for 1971 and 1972 with the Internal Revenue Service Centers, Ogden, Utah, and Fresno, Calif. Petitioners resided in Pacific Palisades, Calif., when they filed their petition in this proceeding.

During 1971 and 1972, petitioner was employed as vice

---

[1]All section references are to the Internal Revenue Code of 1954, as amended.

president and secretary-treasurer of Mattel, Inc. (hereinafter Mattel). Mattel, a Delaware corporation, has its principal place of business at Hawthorne, Calif.; its stock was listed on both the New York Stock Exchange and the Pacific Coast Stock Exchange during 1971 and 1972.

As an officer of Mattel, petitioner was granted qualified stock options to purchase Mattel stock pursuant to qualified stock option plans adopted in 1960, 1962, 1967, 1968, and 1969. The qualified stock option plans provided that option grants were to be made at no less than the fair market value of the stock on the grant date. Substantially all of the options granted under the qualified stock option plans expired 5 years from the date of grant, were contingent upon continued employment, and were exercisable in installments as determined by Mattel's board of directors or special executive committee.

On May 19, 1971, the shareholders of Mattel authorized an alternate stock plan whereby participants in the qualified stock option plans could exchange their qualified options for shares of Mattel stock without paying any cash. Under the alternate stock plan, the number of shares to be received by a participant would be determined under the following formula: the excess of the aggregate market value of the shares of Mattel stock covered by the surrendered options over the aggregate exercise price of the surrendered options would be first determined; such excess then would be multiplied by one and three-fourths; the resultant amount would equal the aggregate market value of the stock to be received by the participant; and the participant would receive the number of shares of Mattel common stock having such aggregate market value.

At the beginning of 1972, petitioner held options granted in 1967 and 1968 under Mattel's qualified stock option plans for the total purchase of 2,400 shares of Mattel stock. By agreements dated February 22, 1972, and March 28, 1972, petitioner surrendered these unexercised qualified stock options pursuant to the alternate stock plan. Under the agreement of February 22, 1972, Mattel issued 838 shares of its common stock to petitioner; under the agreement of March 28, 1972, Mattel issued 1,822 shares of its common stock to petitioner.

The 2,660 shares of Mattel stock received by petitioner as described above were registered with the Securities and

Exchange Commission pursuant to the Securities Act of 1933, ch. 38, tit. I, 48 Stat. 74,[2] and were not subject to any restrictions on resale under such act. Petitioners, through a broker, could have sold the shares on the New York Stock Exchange after they were issued to them. Had petitioners sold the shares, buyers would not have received shares that were subject to any restrictions on resale. However, under the Securities Exchange Act of 1934, ch. 404, sec. 16(b), 48 Stat. 896[3] (hereinafter sec. 16(b), Securities Exchange Act of 1934), any profit from the sale of that Mattel stock within 6 months after petitioners' receipt of the stock would have inured to and been recoverable by Mattel.

On petitioner's wage and tax statement (Form W–2) for 1972, Mattel included $75,954 as "other compensation" from the transfer of shares to petitioner. Such amount was calculated by valuing the shares transferred at the closing price for Mattel common stock on the New York Stock Exchange on the respective dates of issue, February 22, 1972, and March 28, 1972. On February 22, 1972, the high, low, and closing prices of a share of Mattel common stock on the New York Stock Exchange were $33⅛, $32⅛, and $32⅝, respectively. On March 28, 1972, the high, low, and closing prices of a share of Mattel common stock on the New York Stock Exchange were $27⅝, $26⅝, and $26⅝, respectively.

On their Federal income tax return for 1972, petitioners reported income of $43,367.50 from the receipt of stock under the alternate stock plan, valuing the shares at the lowest price of the stock 6 months after the date of acquisition based on section 16(b), Securities Exchange Act of 1934, and based on section 83. Respondent determined that petitioners improperly valued the stock received under the alternate stock plan and that it should have been valued at $75,954.

As late as February 5, 1973, Mattel publicly stated that it would report satisfactory earnings from operations for its fiscal year ended February 3, 1973. On February 23, 1973, Mattel announced that it expected to report a substantial net operating loss for fiscal 1973. The loss finally reported for fiscal 1973 was approximately $32 million.

Mattel became the object of class action lawsuits, the first of

---

[2]Reenacted into positive law as the Securities Act of 1933, 15 U.S.C. sec. 77 (1976).

[3]Reenacted into positive law as the Securities Exchange Act of 1934, 15 U.S.C. sec. 78 p(b) (1976).

which was filed on March 9, 1973, that alleged violations by Mattel of the antifraud provisions of the Federal securities laws. On August 5, 1974, a complaint was filed against Mattel by the Securities and Exchange Commission; also on August 5, 1974, Mattel was permanently enjoined from violations of antifraud and corporate reporting provisions of the Securities Exchange Act of 1934.

On September 6, 1974, Mattel issued a press release stating that it had discovered information which, if verified, would raise substantial questions as to the accuracy of Mattel's financial statements for the fiscal years ended January 30, 1971, and January 29, 1972, and would also affect Mattel's financial statements for prior and subsequent years. On September 6, 1974, the trading of Mattel shares on the New York Stock Exchange and the Pacific Coast Stock Exchange was suspended, at which time the price of 1 share of Mattel common stock was $1. On September 6 and 9, 1974, Mattel furnished preliminary information to the Securities and Exchange Commission about improprieties concerning fiscal years ending January 30, 1971, and January 29, 1972. On September 30, 1974, Mattel's independent public accountants, Arthur Andersen & Co., resigned.

On November 26, 1974, a judgment was filed in the United States District Court, Central District of California, pursuant to which a special counsel and special auditor were appointed. On November 3, 1975, the report of the special counsel (together with the report of the special auditor) was filed with the same United States District Court and was submitted to the Securities and Exchange Commission. The report of the special counsel included the following conclusion:

The investigation revealed that Mattel's annual and interim financial reports, together with related releases of financial information to the public and filed with the SEC, were, for various periods and in various respects, deliberately false and misleading. The financial misstatements were apparently motivated by a desire to maintain the appearance of continued corporate growth.

On May 26, 1977, the settlement of all litigation in the consolidated class action cases was approved. The settlement provided for a $34-million settlement fund consisting of cash and securities to be distributed pro rata, based on claimed and proven losses, to current and former shareholders of Mattel who acquired stock between May 1, 1968, and December 31, 1975.

On February 16, 1978, a Federal grand jury in Los Angeles,

Calif., returned a 10-count criminal indictment accusing five persons who were officers, directors, or employees of Mattel of numerous violations of Federal law arising out of the preparation and distribution of Mattel's financial statements for 1969 through 1974.

## ULTIMATE FINDING OF FACT

The fair market value of each of the shares of Mattel common stock issued under the agreement dated February 22, 1972, was equal to the mean price between the high and low trading prices for a share of Mattel common stock on the New York Stock Exchange on February 22, 1972. Likewise, the fair market value of each of the shares of Mattel common stock issued under the agreement dated March 28, 1972, was equal to the mean price between the high and low trading prices for a share of Mattel common stock on the New York Stock Exchange on March 28, 1972.

Petitioners' rights in the Mattel common stock issued under the agreements dated February 22 and March 28, 1972, were transferable on those dates.

## OPINION

Petitioners make four contentions in support of their position: (1) That the trading price on an exchange does not establish the fair market value of a company's stock where a deliberate, massive fraud concealed and materially misstated the true condition of the company; (2) that potential application of section 16(b), Securities Exchange Act of 1934, reduced the fair market value of the stock received by petitioner below its price on the New York Stock Exchange; (3) alternatively, that the shares of Mattel common stock when received by petitioners were nontransferable, subject to a substantial risk of forfeiture, and not includable in income until the expiration of the 6-month period prescribed by section 16(b), Securities Exchange Act of 1934; and (4) that if section 16(b), Securities Exchange Act of 1934, is a restriction to be ignored for purposes of section 83, then section 83(a) is unconstitutional under the Fifth Amendment to the Constitution of the United States.

Respondent argues that petitioners' contentions are without merit and that the value of the shares received by petitioners

was $75,954. For the reasons set forth below, we agree that petitioners' contentions must be rejected.

The focal point of this controversy is section 83(a), which provides as follows:

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

Petitioners' first contention is that, because a deliberate, massive fraud concealed and materially misstated the true condition of Mattel, the trading prices of Mattel common stock on the New York Stock Exchange on February 22 and March 28, 1972, do not establish the fair market value of the Mattel common stock received by petitioners on those dates. We disagree.

The cases cited by petitioners to convince us that the stock exchange price should not be used here to determine fair market value are factually distinguishable from the instant case. However, this Court faced a similar factual situation in *Estate of Wright v. Commissioner*, 43 B.T.A. 551 (1941) (hereinafter *Wright*). In *Wright*, the petitioner contended that the trading price of the stock in question on the New York Stock Exchange was the result of misrepresentations and concealments of which purchasers and sellers on the New York Stock Exchange were unaware. Therefore, the petitioner contended that such trading price should not be used to establish the fair market value of the stock for purposes of valuing the gross estate involved there. We disagreed, saying in part:

[The estate's] securities could have been sold, and would have been had they been offered, under identical circumstances and at a comparable price with all of the stock which actually was traded in. What petitioner's position would

require us to hold, therefore, is that a universally accepted market price, the result of numerous transactions in which the general public freely participated, should be disregarded because more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed. This does not prove that the market did not exist or that the sales did not take place. Nor does it show that they did not fairly evaluate petitioner's stock at the time. We think it unnecessary to proceed so far in applying the phrase "fair market value." And the administrative and judicial difficulties which would be involved in the adoption of any different rule convince us that petitioner's position is untenable. If it were always necessary to discover whether every material fact was known to the public before stock exchange prices could be relied upon in fixing fair market value, and indeed to determine what factors are and what are not material in the operations of the whole body of the trading public, it would, we think, be impossible for administrative officers or taxpayers to make an intelligent approximation of their own situation. Nothing in the position of petitioner or others similarly situated requires any such result. [43 B.T.A. at 556.]

The rationale expressed by this Court in *Wright* is equally persuasive here and our decision in *Wright* controls the outcome of the instant case. Therefore, we have found as a fact, and now hold, that the trading prices of the Mattel common stock on the New York Stock Exchange on February 22 and March 28, 1972, establish the fair market value of petitioners' stock for purposes of section 83(a). Specifically, the fair market value of the 838 and 1,822 shares of Mattel common stock received by petitioners is the mean price at which the stock was traded on the New York Stock Exchange on February 22 and March 28, 1972, respectively. *Kolom v. Commissioner*, 71 T.C. 235 (1978), on appeal (9th Cir., Jan. 26, 1979).

As a premise for their second contention, petitioners argue that section 16(b), Securities Exchange Act of 1934, is not a restriction within the meaning of section 83(a). Therefore, they contend that for purposes of section 83(a), the potential application of section 16(b), Securities Exchange Act of 1934, reduced the fair market value of the Mattel common stock received by petitioner on February 22 and March 28, 1972, below the trading price of such stock on the New York Stock Exchange on those dates. Petitioners' premise is invalid; section 16(b), Securities Exchange Act of 1934, is a restriction within the meaning of section 83(a). Cf. *Kolom v. Commissioner, supra;* cf. *Pledger v. Commissioner*, 71 T.C. 618 (1979); cf. *Bayley v. Commissioner*, 69 T.C. 234, 244 (1977), on appeal (9th Cir., Feb. 7,

1978); cf. *Frank v. Commissioner*, 54 T.C. 75, 95–96 (1970); cf. *Hirsch v. Commissioner*, 51 T.C. 121, 134–137 (1968); but cf. *Frank v. Commissioner*, 447 F.2d 552, 556 (7th Cir. 1971), affg. 54 T.C. 75 (1970). Therefore, under section 83(a), the fair market value of the stock received must be determined as it was above, i.e., without regard to the restrictions imposed by section 16(b), Securities Exchange Act of 1934. Having disposed of petitioners' second argument, we move to their third.

Petitioners' third contention, advanced alternatively to their second contention, is that potential application of section 16(b), Securities Exchange Act of 1934, caused the shares of Mattel common stock received by petitioners on February 22 and March 28, 1972, to be nontransferable and subject to a substantial risk of forfeiture and, therefore, that the stock so received should be valued at dates when section 16(b), Securities Exchange Act of 1934, no longer applied to petitioner, i.e., 6 months later than the dates of receipt. Petitioners reported their income for 1972 in a manner consistent with this position.

Section 83(a)(1) requires that the fair market value of the stock received by petitioners must be determined at the earlier of two dates: when the rights of petitioners in the stock became transferable or when such rights became not subject to a substantial risk of forfeiture. Section 16(b), Securities Exchange Act of 1934, does not restrict the transferability of shares of stock but rather provides for the regurgitation of profits from "insider trading." Since section 16(b), Securities Exchange Act of 1934, did not restrict the transferability of the shares of Mattel stock received by petitioners, and since we have found as facts that petitioners, through a broker, could have sold the shares of Mattel stock on the New York Stock Exchange after such stock was issued to petitioners, we have found as an ultimate fact that the shares of Mattel stock issued to petitioners under agreements dated February 22, 1972, and March 28, 1972, were transferable on those dates. Therefore, we hold that petitioners valued their Mattel common stock on the wrong date; they should have valued it as of February 22, 1972, for 838 shares and as of March 28, 1972, for 1,822 shares.

Petitioners' final contention is that if section 16(b), Securities Exchange Act of 1934, is a restriction to be ignored for purposes of valuation under section 83, then section 83(a) is unconstitutional under the Fifth Amendment to the Constitution of the

United States. We find this argument unpersuasive for the reasons set forth in *Sakol v. Commissioner*, 67 T.C. 986, 992–996 (1977), affd. 574 F.2d 694 (2d Cir. 1978), cert. denied 439 U.S. 859 (1978).

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155.*