GEORGE E. JOHNSON AND SYLVIA V. JOHNSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10058–76.     Filed April 22, 1980.

*Jack A. Cozy* and *Earl C. Crouter*, for the petitioners.
*John O. Kent*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $199,578 in the petitioners' Federal income tax for 1971 and an addition to the tax of $9,979 under section 6653(a), I.R.C. 1954.[1] The parties have settled certain issues, and the issues remaining for decision are: (1) Whether for purposes of determining the income from the exercise of employee stock options, the fair market value of the stock so acquired is to be based on its prices on the New York Stock Exchange even though it was later learned that the corporate officers had misrepresented the corporation's earnings; and (2) whether the petitioners are liable for the addition to tax under section 6653(a) for their failure to report and pay a tax on the exercise of a stock option as an item of tax preference under section 56.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, George E. Johnson and Sylvia V. Johnson, husband and wife, resided in San Marino, Calif., when they filed their petition in this case. They filed their joint Federal income tax return for 1971 with the Internal Revenue Service Center, Fresno, Calif. Mr. Johnson will sometimes be referred to as the petitioner.

For several years prior to the year in issue, the petitioner was senior vice president of Audio Magnetics Corp. (Audio). Audio manufactured and sold magnetic tapes and, in general, was a highly successful corporation. Audio had a qualified stock option plan for its employees, and the petitioner had an option to purchase 15,600 shares of the capital stock of Audio at the option price of $12.505 per share.

In 1969, Audio was acquired by Mattel, Inc. (Mattel), a large independent toy manufacturing company, and thereafter, Audio

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect for the year in issue.

continued as a subsidiary of Mattel. Although the petitioner opposed the transfer of the control of Audio to Mattel, he continued, even after such transfer, to serve as senior vice president responsible for manufacturing and sales. However, he had nothing to do with the business of manufacturing and selling toys or with the financial operations of Mattel.

In connection with its acquisition of Audio, Mattel assumed Audio's stock option plan, and on or about February 1, 1969, it granted to the petitioner qualified stock options to purchase some common stock of Mattel. The petitioner exercised such options on or about the dates set forth below at the following costs:

| Date exercised | Shares acquired | Cost per share |
|---|---|---|
| 1/5/71 | 7,370 | $1.98502 |
| 2/8/71 | 29,478 | 1.98502 |

The high, low, closing, and the mean selling prices for Mattel common stock on the New York Stock Exchange (NYSE) on such dates were as follows:

| Date | High | Low | Closing | Mean |
|---|---|---|---|---|
| 1/5/71 | 36⅛ | 35¼ | 35⅞ | $35.6875 |
| 2/8/71 | 44 | 42½ | 44 | 43.25 |

Sometime after the close of 1971, Mattel prepared certain Federal tax forms with respect to the petitioner's exercise of the qualified stock options. On such forms, Mattel listed $35.875 as the fair market value of the stock received by the petitioner on January 5, 1971, and $44 as the fair market value of the stock received by him on February 8, 1971. The petitioner received copies of such forms.

The petitioner began to have disagreements with the top management of Mattel in the latter part of 1970 and the early part of 1971. He was aware that Mattel was experiencing financial difficulties and was using questionable sales practices to create the impression of earnings. Consequently, he left Audio and Mattel in April 1971.

During the mid–1970's, Mattel became the object of a class action filed by former stockholders on behalf of all persons who purchased or otherwise acquired common stock of Mattel between May 1, 1968, and December 31, 1974. In the action, it was alleged that Mattel stock had been traded at inflated prices

due to incorrect or misleading financial statements, press releases, and accounting methods and other practices which had the effect of incorrectly stating Mattel's income, assets, liabilities, and general financial condition. The class action was eventually settled, and pursuant to the settlement, the petitioner received cash and warrants to purchase Mattel stock at a bargain price.

In 1974, the Securities and Exchange Commission (SEC) brought an action against Mattel, stopped the trading in its stock, and required a special audit and a change in Mattel's management due to its overstated profits. In 1978, a Federal grand jury in Los Angeles returned a 10-count criminal indictment accusing five persons who were officers, directors, or employees of Mattel of numerous violations of Federal law in the preparation and distribution of Mattel's financial statements for 1969 through 1974. All five indicted Mattel employees entered pleas of nolo contendere, and they were fined and sentenced by the U.S. District Court for the Central District of California.

On their joint Federal income tax return for 1971, the petitioners did not include in income any amount by reason of the qualified stock options exercised by the petitioner in that year. The petitioners' return for that year was prepared by a firm of certified public accountants. The petitioner provided the firm with any information it requested, including information about stock transactions from brokerage firms, bank account statements, and other financial information. The firm was aware that the petitioner had stock options granted by Mattel, but the petitioners failed to show that the firm was given any information indicating that the petitioner had exercised such options in 1971. In his notice of deficiency, the Commissioner determined that the petitioners' taxable income for 1971 should be increased by the amount representing the difference between the option price of the Mattel stock and its fair market value on the exercise dates. He now maintains that such fair market value was $35.6875 on January 5, 1971, and $43.25 on February 8, 1971, and not the higher amounts asserted in the deficiency notice. The Commissioner also determined that the petitioners were liable for a 5-percent addition to tax under section 6653(a) due to negligence or intentional disregard of rules and regulations.

## OPINION

The first issue to be considered is the fair market value of the Mattel stock on the dates the petitioner exercised his options. The issue arises because of the tax imposed by section 56 on items of tax preference.[2] Section 57(a)(6) treats the bargain element arising from the exercise of an employee stock option as an item of tax preference and provides in part: "With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option * * * or a restricted stock option * * * the amount by which the fair market value of the share at the time of exercise exceeds the option price." Section 1.57–1(f)(3), Income Tax Regs., provides that the fair market value of such stock is to be determined as of the date of the exercise of the option. The Commissioner contends that such fair market value is the mean between the highest and lowest quoted selling prices on the NYSE on the dates the petitioner exercised his options. On the other hand, the petitioners contend that such quotations did not reflect the real value of the stock because such quotations resulted from "gross, flagrant and criminal frauds on the part of Mattel and its officers and agents."

The provisions of section 57(a)(6) refer to the "fair market value" of the stock which is the subject of the exercise of the qualified stock option. When Congress enacted this section, the term "fair market value" had a long-established and clearly defined meaning. *Kolom v. Commissioner*, 71 T.C. 235, 243 (1978), on appeal (9th Cir., Jan. 26, 1979). Generally, where stock is traded on a national exchange, the fair market value of relatively small quantities of the stock on any date on which the stock is traded on that exchange is the price at which the stock is sold. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Freshman v. Commissioner*, 33 B.T.A. 394, 402–403 (1935). The obvious reason for using the exchange price as the fair market value of the stock is that such price is the best evidence of what

---

[2]Sec. 56 provides in part:

(a) IN GENERAL.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

(1) the sum of the items of tax preference in excess of $30,000, is greater than
(2) the sum of—
(A) the taxes imposed by this chapter for the taxable year * * * reduced by the sum of the credits allowable * * *

a willing buyer will pay a willing seller for the stock. There are situations in which the quoted exchange prices are not indicative of the value of the stock, but such situations involve unusual circumstances, such as when a large block of stock is to be valued or when the stock to be valued is not freely transferable. *Frizzelle Farms, Inc. v. Commissioner*, 61 T.C. 737, 743 (1974), affd. per curiam 511 F.2d 1009 (4th Cir. 1975).

The petitioners point to the classic definition of fair market value as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both being informed; they argue that the NYSE prices of Mattel stock on the exercise dates did not reflect such a value of the stock because the petitioner was not fully informed as a result of all the financial misrepresentations at Mattel. Similar facts were involved in *Estate of Wright v. Commissioner*, 43 B.T.A. 551, 555 (1941), where we stated: "If we were seeking to fix a fair value, rather than a market value which is fair, such considerations would not be without appeal." In this case, as in *Estate of Wright*, the petitioner's stock had a market value, and the stock could have been sold by the petitioner at the quoted prices.[3] In the *Estate of Wright*, we stated:

[The estate's] securities could have been sold, and would have been had they been offered, under identical circumstances and at a comparable price with all of the stock which actually was traded in. What petitioner's position would require us to hold, therefore, is that a universally accepted market price, the result of numerous transactions in which the general public freely participated, should be disregarded because more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed. This does not prove that the market did not exist or that the sales did not take place. Nor does it show that they did not fairly evaluate petitioner's stock at the time. We think it unnecessary to proceed so far in applying the phrase "fair market value." And the administrative and judicial difficulties which would be involved in the adoption of any different rule convince us that petitioner's position is untenable. If it were always necessary to discover whether every material fact was known to the public before stock exchange prices could be relied upon in fixing fair market value, and indeed to determine what factors are and what

---

[3]While we recognize that the petitioner may have been under a practical constraint to hold the stock for a period of time to obtain capital gains rates upon the sale of the stock, such consideration does not alter our decision. Cf. *Kolom v. Commissioner*, 71 T.C. 235, 249 (1978), on appeal (9th Cir., Jan. 26, 1979).

are not material in the operations of the whole body of the trading public, it would, we think, be impossible for administrative officers or taxpayers to make an intelligent approximation of their own situation. Nothing in the position of petitioner or others similarly situated requires any such result. [43 B.T.A. at 556.]

In *Horwith v. Commissioner,* 71 T.C. 932 (1979), we considered the fair market value of Mattel stock received by the exercise of stock options in February and March 1972. In that case, the Court was aware of the fact that Mattel was the object of class actions filed by its shareholders based on its financial improprie- ties; that a complaint was filed against Mattel by the SEC in August 1974; that in September 1974, the trading of Mattel shares on the NYSE and the Pacific Coast Stock Exchange was suspended; that in November 1974, a report of special counsel appointed by the U.S. District Court, Central District of California, was filed with that court; that in such report, it was concluded that the financial reports which Mattel released to the public and filed with the SEC were, for various periods and in various respects, deliberately false and misleading; and that a Federal grand jury in Los Angeles had returned a 10-count criminal indictment accusing five of Mattel's key employees of numerous violations of Federal law in the preparation and distribution of its financial statements for 1969 through 1974. *Horwith v. Commissioner,* 71 T.C. at 935–937. We adopted the rationale of the *Estate of Wright* and held that, notwithstanding the misinformation concerning the financial conditions of Mat- tel, the fair market value of its stock should be based on the mean between the highest and lowest quoted exchange prices on the dates the options were exercised. (71 T.C. at 939.)

In the case now before us, we know that the key employees of Mattel pled nolo contendere to the crimes of which they were charged, but that fact does not warrant using a different method for valuing the stock of Mattel. The petitioners argue that for purposes of this case, we may treat the nolo plea as having the same effect as a guilty plea; thus, they maintain that the key officers have in effect admitted the truth of the allegations against them. However, we need not decide the effect of the nolo plea. Under the rationale of our holdings in *Estate of Wright* and *Horwith,* it is immaterial whether the officers did in fact misrepresent the earnings and profits of the corporation; in any event, the fair market value of the Mattel

stock is to be based on prices for which such stock was sold on the NYSE.

The numerous cases on which the petitioners rely do not support their position. In those cases, the courts may have valued the stock in issue on a basis other than market prices, but the courts did so because the stock was not sold on any exchange, or because the stock valued was part of a large block of stock, or because the stock price was artificially controlled by a syndicate. See, e.g., *Hamm v. Commissioner*, 325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964); *Rogers v. Strong*, 72 F.2d 455 (3d Cir. 1934), cert. denied 293 U.S. 621 (1934); *Walter v. Duffy*, 287 F. 41 (3d Cir. 1923); *Wallis Tractor Co. v. Commissioner*, 3 B.T.A. 981 (1926); *Fruen Investment Co. v. Commissioner*, 2 B.T.A. 542 (1925); *Rosenblatt v. United States*, an unreported case (S.D. W.Va. 1937, 20 AFTR 1341, 37-2 USTC par. 9555). Here, there were no such circumstances. The petitioners presented the testimony of an expert witness, who undertook to determine an intrinsic value of the stock without relying on its market price. However, since we have concluded that the stock is to be valued on the basis of its market prices, such testimony does not help the petitioners. *United States v. Cartwright*, 411 U.S. at 551; *Horwith v. Commissioner*, 71 T.C. at 939; *Kolom v. Commissioner, supra*. Accordingly, we hold that the fair market value of the Mattel stock received by the petitioners is the mean between the highest and lowest prices at which the stock was traded on the NYSE on the dates the options were exercised by the petitioner.

We next consider whether the petitioners' failure to report the exercise of their stock options and to pay the tax on tax preference items under section 56 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a).[4] The burden of proof on this issue is on the petitioners. *Bixby v. Commissioner*, 58 T.C. 757 (1972); *Inter-American Life Insurance Co. v. Commissioner*, 56 T.C. 497 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972); *Rosano v. Commissioner*, 46 T.C. 681 (1966). The petitioner contends that

---

[4]In relevant part, sec. 6653(a) provides:

If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

he relied on his accountants to prepare his tax return. He maintains that he is not an accountant and could not be expected to understand "a very complicated issue" as the one presented in his case.

The petitioners cannot avoid their responsibility for filing a proper return merely by showing that the return was prepared for them by their accountants. *Pritchett v. Commissioner*, 63 T.C. 149, 174 (1974). The accountants were aware that the petitioner possessed qualified stock options to purchase the Mattel stock, but the petitioners have not alleged or proved that they informed the accountants of the fact that the options were exercised in 1971. The petitioner received copies of the Internal Revenue Service forms prepared by Mattel with respect to the exercise of his options, but there is no showing that he furnished such forms to the accountants in connection with the preparation of the tax return. When a taxpayer fails to furnish necessary information to an accountant for the preparation of a tax return, the taxpayer is liable for the penalty. *Lester Lumber Co. v. Commissioner*, 14 T.C. 255, 263 (1950).

Nor can the petitioners avoid the penalty by claiming that there was a genuine dispute over the method for valuing the stock. Even if the stock had been valued in the manner suggested by them, the exercise of the options resulted in some items of tax preference, and those items should have been reported on the return. Accordingly, we sustain the Commissioner's imposition of the addition to tax under section 6653(a) since the petitioner has not proven that his failure to report the exercise of the Mattel stock options in 1971 was not due to negligence.

Due to concessions by the parties,

*Decision will be entered under Rule 155.*