## APPEAL OF FRUEN INVESTMENT CO.

Docket No. 1126.    Submitted May 20, 1925.    Decided September 8, 1925.

Value of stock and bonds received on sale of corporate assets determined for purpose of computing profit or loss on sale of such assets.

*W. Yale Smiley, Esq.*, and *R. C. Fletcher, Esq.*, for the taxpayer.
*John D. Foley, Esq.*, for the Commissioner.

Before PHILLIPS, GRAUPNER, and TRAMMELL.

The taxpayer appeals from the determination of a deficiency of $14,549.40, income and profits tax for the year 1917, and alleges error by the Commissioner in computing a profit on the sale of the assets of the taxpayer.

#### FINDINGS OF FACT.

1. Taxpayer was organized as a Minnesota corporation in 1894 under the name of Pettijohn Milling Co. In 1895 its name was changed to Fruen Cereal Co., and in April, 1918, to Fruen Investment Co.

2. Taxpayer at first engaged in the cereal business in a small way. The only persons connected with the company up to 1917 were mem-

bers of the Fruen family. Its business showed a gradual growth from its start.

3. On January 31, 1917, it entered into a contract for the sale of its capital assets, which was as follows:

### AGREEMENT.

This agreement, made and entered into this 31st day of January, 1917, by and between the Fruen Cereal Company, a Minnesota corporation, party of the first part, and Wm. F. Bullock, H. C. Malcolm, and the Bullock-Malcolm Company, a Minnesota corporation, parties of the second part, all of said parties being of the city of Minneapolis, Hennepin County, Minnesota, witnesseth:

That the party of the first part agrees to sell to the parties of the second part, all of the property of whatever kind or nature, now owned by the party of the first part, except its stock on hand consisting of grain, fuel, supplies and material of every kind, except as hereinafter enumerated, and except its accounts receivable, said property to be free and clear of any encumbrance or indebtedness whatever, and consisting of the following items, valued by the first party in the amounts set opposite the respective items, namely:

Real estate:

| | |
|---|---:|
| Land | $14,000.00 |
| Buildings | 33,000.00 |
| Water power | 25,000.00 |
| Mill and elevator machinery | 13,923.45 |
| Tools, implements, horses, and wagons | 1,579.90 |
| Office furniture and appurtenances | 536.70 |
| Membership chamber of commerce | 6,000.00 |
| Good will, trade-mark, processes, and advertising | 40,000.00 |
| | 134,040.05 |

upon and after the payment therefor by the second parties of the sum of one hundred thirty-four thousand (134,000) dollars with interest at the rate of five per cent per annum, payable semi-annually on $84,000.00 of the principle [sic] sum, it being understood and agreed that no interest is to be allowed or paid on the item under the head of good will.

### II.

The parties of the second part agree to pay the party of the first part, the said sum of one hundred and thirty-four thousand dollars, payable at such place or places in the said city of Minneapolis, as the first party may direct, in the following manner.

Twenty-five thousand (25,000.00) dollars payable herewith in the capital stock of the International Cereal Company hereinafter referred to; two thousand (2,000) dollars payable within two weeks from the date of this contract, in cash; and a cash payment of ten thousand (10,000) dollars or more, within each and every period of ninety days hereafter until said sum of one hundred and thirty-four thousand (134,000) dollars is paid in full, and thereupon the second parties will become the owners of said property. That the title and possession of said property shall be and remain in the first party until the sum of one hundred and thirty-four thousand (134,000) dollars is paid in full, as herein provided.

### III.

In case of the failure of the second parties to make any of the payments or any part thereof, or to do or perform any of the terms or conditions of this contract to be by the said parties of the second part or any of them, or the said International Cereal Company, done or performed, then this contract shall, at the option of the first party, be cancelled and determined, and all right, title, and interest acquired thereunder by the second parties or the International Cereal Company, or any of them, be forfeited by giving to William F. Bullock, one of the second parties, thirty (30) days' notice in writing of the intention of the first party to cancel and determine this contract, and to annul all right, title, and interest acquired thereunder by the second parties and the International Cereal Company, or any of them, said notice to be in accordance with the statute in such case made and provided. It is further agreed that thirty days is a reasonable and sufficient notice to be given and shall be sufficient to cancel all obligations hereunto on the party of the first part; and in case this contract is so determined and canceled for such payments as shall have been made hereunder in cash the first party agrees to issue to the International Cereal Company six per cent cumulative preferred stock of the first party. It is mutually agreed that time of payment shall be an essential part of this contract.

### IV.

It is further agreed that upon payment of the sum of sixty thousand (60,000.00) dollars in cash payments hereunder, the parties of the second part shall require the party of the first part to transfer the said property to the second parties upon the execution and delivery by the second parties to the first party of mortgages and notes, satisfactory in form and terms to the party of the first part, upon all the real and personal property herein mentioned, payable in the manner hereinbefore specified, but with interest at the rate of six per cent per annum, and the second parties shall then take over and operate the business of the first party, and the first party shall cease to have any interest or liability in connection therewith, except its interest retained by reason of the ownership of said notes and mortgages. At the time of the transfer of the possession of the property mentioned herein, by the first party to the second parties, the second parties shall purchase from the first party, and pay the cost price thereof, all of the stock on hand hereinbefore enumerated and described. The party of the second part also agrees that the name of Fruen shall not be used after January 1, 1920.

### V.

The parties of the second part agree to immediately organize a Minnesota corporation, to be known as the International Cereal Company, that said corporation shall have four hundred thousand (400,000) dollars of capital stock divided into forty thousand (40,000) shares of common stock, at the par value of ten (10) dollars per share; that said stock shall be nonassessable; that said corporation shall be organized as a manufacturing corporation solely, and that none of the stock of said corporation shall be sold for less than the par value thereof.

### VI.

The parties of the second part agree to assign in writing and transfer this agreement to said International Cereal Company forthwith upon its organization and the parties of the second part agree that said International Cereal Company shall thereupon ratify, assume, and agree in writing to assume and

perform each and all of the covenants and agreements undertaken and entered into by the parties of the second part thereto. The parties of the second part also agree to thereupon furnish the party of the first part a duplicate of said written agreement made by the said International Cereal Company.

## VII.

All moneys received from the sale of stock in said International Cereal Company, less a commission of twenty per cent thereof, and (200) two hundred shares of the capital stock of the International Cereal Company, and less any premium over and above the par value therefor, which may be received, shall be paid forthwith to the party of the first part until said sum of one hundred and thirty-four thousand dollars and all due interest is paid in full. The parties of the second part shall pay out of said twenty per cent commission and such premium as may be received, any and every expense incidental to, or in any way connected with, the sale of stock, so that the said party of the first part, until the payment of the sum of one hundred and nine thousand dollars in cash ($109,000.00) to be paid hereunder, and thereafter the said International Cereal Company shall receive absolutely eighty per cent (80%) of cash upon the sale of all of the stock of the International Cereal Company.

## VIII.

It is further agreed that the parties of the second part shall be entitled to and shall receive all the profits from the operation of the business of the party of the first part from and after the date hereof, but that the party of the first part shall retain the absolute ownership of all its business, property and profits, and the absolute management and control of all its said business, property, and profits, until the payment of all money and the full performance of all of the terms and conditions of this agreement, by the parties of the second part and by the said International Cereal Company.

4. The Bullock-Malcolm Co. is a Minnesota corporation which was organized in January, 1917. Bullock and Malcolm were brokers or salesmen engaged in the business of selling stock.

5. The Bullock-Malcolm Co. caused the International Cereal Co. to be organized under the laws of Minnesota and immediately assigned this contract to it. At the time of such assignment the International Cereal Co. and the Bullock-Malcolm Co. entered into the following contract:

This agreement made and entered into this 8th day of February, 1917, by and between the International Cereal Company, a Minnesota corporation, hereinafter called the employer, and the Bullock-Malcolm Company, a Minnesota corporation, hereinafter called the employe;

In consideration of the agreement on the part of the employe hereinafter contained to be by it kept and performed, the employer employs the employe to sell its capital stock and agrees to pay said employe in full for said serv ices by delivering to it on the date of the execution of this contract two hundred (200) shares of the capital stock of the employer and to pay whatever amount said employe received from the sale of said stock in excess of eight dollars ($8.00) per share; and,

In consideration of the agreement on the part of the employer contained to be by it kept and performed, the employe agrees to undertake the sale of the capital stock of the employer, devote its time and best energy to said sale, and

92208—26——35

accept as full compensation for said services two hundred (200) shares of the capital stock of the employer and whatever amount said employe receives from the sale of said stock in excess of eight dollars ($8.00) per share.

It is mutually agreed that none of said stock shall be sold for less than the par value thereof nor for more than twelve and 50/100 dollars ($12.50) per share; that all expenses connected with the sale of said stock shall be borne by the employe; that said stock may be sold for all cash or part cash and part notes as the employe shall decide; that all checks given for the purchase of stock shall be made payable to the employer or order and all checks and notes given for the purchase of stock shall be delivered to the employer; that as each sale is made the employer shall return to the employe what amount is realized from said sales in excess of eight dollars ($8.00) per share, the employe to receive whatever cash is paid by purchasers of stock to the extent of not to exceed four and 50/100 dollars ($4.50) for each share sold; that unless canceled as hereinafter provided this agreement shall remain in full force and effect for three (3) years from the date hereof.

It is mutually agreed that inasmuch as the employer has entered into a contract of even date herewith with the Fruen Cereal Co., a copy of which is attached hereto and made a part hereof, that the employe agrees to make sufficient sales of stock and deliver to the employer sufficient cash from said sales to enable the employer to make the payments provided in said contract and if said sales are not made and said cash delivered, the employer at its option may serve notice in writing on the   president of the employe stating that unless said default is remedied within twenty (20) days from the date of said notice, all interest of the employe herein shall cease and if said default be not remedied on the expiration of said twenty (20) day period all interest of the employe herein shall cease and this contract shall be void and of no effect.

It is further mutually agreed that after the employe hereunder shall have sold $200,000 par value of the stock, the employer may require that future sales of stock shall be made at an increased price not to exceed fifteen dollars ($15.00) per share and that in the event the employer exercises said option then and in that event the compensation to be paid to the employe herein shall be the same as herein provided and in addition the employee shall receive one-half of whatever price is received above twelve and 50/100 dollars ($12.50) per share for the sale of said additional $200,000 par value of stock.

6. During the year 1917 taxpayer received $25,000 of the stock of the International Cereal Co., and there was paid to it in varying amounts the sum of $64,000 upon account of the purchase price of its assets. In December, 1917, pursuant to Article IV of the agreement of sale, the assets were transferred to the International Cereal Co., which executed three notes of $15,000 each, payable in 30, 60, and 90 days, respectively. In 1918, $10,000 was paid upon account of such notes and the balance exchanged for $35,000 par value, out of a total issue of $75,000, of the first mortgage bonds of the company. In 1923 the International Cereal Co. became bankrupt, the creditors received 30 per cent on their claims, the stockholders received nothing, and the assets pledged as security for the mortgage bonds were sold subject to such mortgage, which has not been foreclosed. Taxpayer did not sell or otherwise dispose of the stock and bonds which

it received in the International Cereal Co., except for $5,000 par value which it induced an attorney to accept in payment for services rendered.

7. The Commissioner determined the sales price to be $134,000 and the depreciated cost, or March 1, 1913, value, to be $92,090.65, computed a taxable gain of $41,909.35, and computed the tax upon that basis. It is stipulated between taxpayer and Commissioner that the depreciated cost, or March 1, 1913, value of the assets sold is $92,090.65, no allowance being made for good will, and we so find.

8. It was further stipulated that the net income of the taxpayer for 1917, aside from any gain realized on the sale of its assets to International Cereal Co., was $2,893.04, and we so find.

9. The Bullock-Malcolm Co. sent its salesmen into the smaller towns and cities in Minnesota, Wisconsin, and Iowa. These salesmen sold the stock in small lots, usually for part cash and part notes. Under the terms of its contract for the sale of the stock, the first cash proceeds were retained by the Bullock-Malcolm Co. to pay its commission.

10. The directors of the International Cereal Co., following its organization, were, in addition to Bullock and Malcolm, a dealer in fish, three advertising specialists, an operator of a restaurant and small flour jobbing business, and a real estate agent who was also engaged in the grain business. None of these directors had any experience in the operation of a cereal business.

11. The International Cereal Co. began business with no other assets than its contract to purchase the assets of the taxpayer. The value of its stock was purely speculative at the time the assets of the taxpayer were transferred to it.

### DECISION.

The deficiency determined by the Commissioner is allowed in part and disallowed in part and should be computed upon an income for 1917 of $19,802.39. Final determination will be settled on consent or on 15 days' notice, in accordance with Rule 50.

### OPINION.

PHILLIPS: This appeal involves the determination of the value of the stock and notes received by taxpayer upon the sale of its assets under the circumstances set out in the findings of fact. The Commissioner has determined the tax upon the theory that such instruments were worth par; taxpayer claims that they had no market value.

It appears from the testimony that Bullock and Malcolm, the individuals responsible for the purchase of the property and the

organization of the International Cereal Co., were promoters and stock salesmen and that the transaction was handled by them throughout as a stock-selling proposition. Apparently the officers of the taxpayer realized that the purchaser was none too sound financially for they provided in their contract that, of the $109,000 to be paid in cash, $60,000 should be paid before the assets were transferred and the remainder then secured by a first lien on the property transferred. Great care was taken to see that $109,000 should be realized from the sale. The secretary and treasurer of the company testified that the Fruen family regarded the business, assets, and good will as worth $109,000, and that the stock of the new company was considered as a bonus rather than as a part of the purchase price. The surrounding circumstances lend credence to this testimony.

The promoters organized a force of salesmen and sent them out into the villages and the smaller cities of Minnesota and Wisconsin, where their efforts proved fruitful, for the stock register of the company shows over 1,000 stock owners, mostly in lots of from 5 to 50 shares, the average probably being about 15. These shares were sold at from $10 to $12.50 per share on the installment plan. The salesmen changed from time to time but throughout the campaign from 10 to 30 salesmen were employed at one time. An examination of the stock register indicates that most of Minnesota and Wisconsin must have been covered for while the whole number of sales in each village is small the number enumerated is large.

A casual examination indicates that Sleepy Eye, Minn., was awakened to this opportunity by the salesmen, who sold several small blocks of stock there. But, of course, the smaller places could not hope to compete with Minneapolis and Milwaukee, where a larger group of purchasers was found, but the individual sales were still small in amount. St. Paul seems to have escaped unscathed. The testimony does not show whether this was because its residents were unusually canny or because none of the salesmen had relatives or friends there.

The Commissioner contends that these sales establish a market value for the stock of from $10 to $12.50 per share. In our opinion, they are clear testimony to its doubtful value. The brokers were to be paid a commission of from 20 per cent to 35 per cent of the selling price; this was to be paid them from the first cash receipts; they did not obligate themselves to purchase or sell any part of the stock, and instead of disposing of the stock in the usual manner it was sold from village to village, in small lots and on installment payments. All these circumstances show conclusively, to our mind, that the stock was not considered worth par by the persons in the best position to know its value. The best that can be said concerning

its value, so far as the testimony in this appeal is concerned, is that it may have had some speculative value; but when we consider the obvious purpose of the promoters who were handling its affairs, and the lack of experience in the cereal business of its board of directors, perhaps we are too optimistic in assigning it even a speculative value.

The testimony also shows the existence of some understanding on the part of the taxpayer and the Bullock-Malcolm Co. that taxpayer would not dispose of its stock while the International Cereal Co. was financing itself by sales of its own stock. It is not shown that there was any binding contract to this effect, and no finding of fact has been made, but it seems clear that taxpayer's officers considered that they were bound by some such agreement.

From all the evidence we conclude that the stock of the International Cereal Co. had no market value which could be determined at the time of its receipt by the taxpayer, and that in computing the gain on the sale no value can be assigned to the stock.

The notes and bonds, however, stand in a different situation. It would seem that under the contract of sale taxpayer could have insisted upon receiving a first-lien mortgage upon the assets transferred to secure payment of the $45,000 balance not yet paid in cash in 1917. Instead, the taxpayer chose in 1918 to receive $10,000 in cash and $35,000 of an issue of $75,000 of first-mortgage bonds. The collateral was substantial and, in our opinion, the Commissioner properly refused to consider them as worth less than par.

TRUSSELL and ARUNDELL not participating.