*547 OPINION.
Phillips:
This appeal involves the determination of the value of the stock and notes received by taxpayer upon the sale of its assets under the circumstances set out in the findings of fact. The Commissioner has determined the tax upon the theory that such instruments were worth par; taxpayer claims that they had no market value.
It appears from the testimony that Bullock and Malcolm, the individuals responsible for the purchase of the property and the *548 organization of the International Cereal Co., were promoters and stock salesmen and that the transaction was handled by them throughout as a stock-selling proposition. Apparently the officers of the taxpayer realized that the purchaser was none too sound financially for they provided in their contract that, of the $109,000 to be paid in cash, $60,000 should be paid before the assets were transferred and the remainder then secured by a first lien on the property transferred. Great care was taken to see that $109,000 should be realized from the sale. The secretary and treasurer of the company testified that the Fruen family regarded the business, assets, and good will as worth $109,000, and that the stock of the new company was considered as a bonus rather than as a part of the purchase price. The surrounding circumstances lend credence to this testimony.
The promoters organized a force of salesmen and sent them out into the villages and the smaller cities of Minnesota and Wisconsin, where their efforts proved fruitful, for the stock register of the company shows over 1,000 stock owners, mostly in lots of from 5 to 50 shares, the average probably being about 15. These shares were sold at from $10 to $12.50 per share on the installment plan. The salesmen changed from time to time but throughout the campaign from 10 to 30 salesmen were employed at one time. An examination of the stock register indicates that most of Minnesota and Wisconsin must have been covered for while the whole number of sales in each village is small the number enumerated is large.
A casual examination indicates that Sleepy Eye, Minn., was awakened to this opportunity by the salesmen, who sold several small blocks of stock there. But, of course, the smaller places could not hope to compete with Minneapolis and Milwaukee, where a larger group of purchasers was found, but the individual sales were still small in amount. St. Paul seems to have escaped unscathed. The testimony does not show whether this was because its residents were unusually canny or because none of the salesmen had relatives or friends there.
The Commissioner contends that these sales establish a market value for the stock of from $10 to $12.50 per share. In our opinion, they are clear testimony to its doubtful value. The brokers were to be paid a commission of from 20 per cent to 35 per cent of the selling price; this was to be paid them from the first cash receipts; they did not obligate themselves to purchase or sell any part of the stock, and instead of disposing of the stock in the usual manner it was sold from village to village, in small lots and on installment payments. All these circumstances show conclusively, to our mind, that the stock was not considered worth par by the persons in the best position to know its value. The best that can be said concerning *549 its value, so far as the testimony in this appeal is Concerned, is that it may have had some speculative value; but when we consider the obvious purpose of the promoters who were handling its affairs,, and the lack of experience in the cereal business of its board of directors, perhaps we are too optimistic in assigning it even a speculative value.
The testimony also shows the existence of some understanding on the part of the taxpayer and the Bullock-Malcolm Co. that taxpayer would not dispose of its stock while the International Cereal Co. was financing itself by sales of its own stock. It is not shown that there was any binding contract to this effect, and no finding of fact has been made, but it seems clear that taxpayer’s officers considered that they were bound by some such agreement.
From all the evidence we conclude that the stock of the International Cereal Co. had no market value which could be determined at the time of its receipt by the taxpayer, and that in computing the gain on the sale no value can be assigned to the stock.
The notes and bonds, however, stand in a different situation. It would seem that under the contract of sale taxpayer could have insisted upon receiving a first-lien mortgage upon the assets transferred to secure payment of the $45,000 balance not yet paid in cash in 1911. Instead, the taxpayer chose in 1918 to receive $10,000 in cash and $35,000 of an issue of $75,000 of first-mortgage bonds. The collateral was substantial and, in our opinion, the Commissioner properly refused to consider them as worth less than par.
Trussell and Arundell not participating.