T.C. Memo. 2001-200


UNITED STATES TAX COURT


TONY L. ZIDAR AND KATHLEEN I. ZIDAR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11484-99.          Filed August 1, 2001.


<u>Jonathan V. Goodman</u>, for petitioners.

<u>Michael J. Calabrese</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


THORNTON, <u>Judge</u>:  Respondent determined a $53,435 deficiency in petitioners' 1992 Federal income tax and a $10,687 addition to tax under section 6662(a).[1]

---

[1] All section references are to the Internal Revenue Code as in effect for the taxable year in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioners underreported their capital gains from the redemption of certain corporate stock; (2) whether Tony L. Zidar conducted his stock car activity with the intent to make a profit; and (3) whether petitioners are subject to the section 6662(a) accuracy-related penalty.[2]

## FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate herein by this reference.

Petitioners

Throughout the year in issue, petitioners were married to one another. In 1993 they separated, and in 1994 they divorced. When they petitioned the Court, petitioners resided in Wisconsin.

Concrete Raising Corporation

In the early 1970's, Tony L. Zidar (Tony) started a business known as Concrete Raising Associates (CRA). CRA's business

---

[2] In their petition and at trial, petitioners contended that Kathleen I. Zidar (Kathleen) had not been served with the notice of deficiency. Although respondent addressed the issue in his opening brief, petitioners have not mentioned the issue either in their opening brief or in their reply brief, and we consider them to have abandoned this contention. See Bradley v. Commissioner, 100 T.C. 367, 370 (1993). In any event, the contention is without merit, as the record shows that respondent mailed the notice of deficiency to Kathleen's last known address, that Kathleen received actual notice, and that she timely filed a petition with the Court. Cf. Mulvania v. Commissioner, 81 T.C. 65 (1983); Freiling v. Commissioner, 81 T.C. 42 (1983); Judge v. Commissioner, T.C. Memo. 1984-527.

involved "mudjacking", which Tony describes as "lifting concrete back to its original position".

About 1972, Tony's brother, Robert Zidar (Robert), became Tony's partner, and they incorporated CRA as Concrete Raising Corp. (CRC). Tony and Robert each owned an equal number of CRC shares. The accounting firm of Conley, McDonald & Sprague performed bookkeeping, record maintenance, and other accounting services for CRC.

Tony and Robert also entered into several commercial real estate joint ventures (the joint ventures), which generally involved purchasing and renovating buildings for lease to tenants. Tony and Robert financed these joint ventures partly by using CRC's financial clout to obtain loans.

CRC made advances to Tony and Robert for, among other things, airplane tickets, furniture, personal expenses, and expenses associated with the joint ventures. All shareholder advances were required to be repaid, and CRC maintained shareholder accounts for both Tony and Robert. An employee from Conley, McDonald & Sprague regularly visited CRC to review and record all shareholder advances in the appropriate accounts. CRC issued Tony and Robert monthly, quarterly, and annual statements showing the balances on their respective shareholder accounts. As of October 1992, Tony's outstanding balance on his CRC shareholder account was $116,831.

Tony and Robert had a stormy business relationship, giving rise to numerous lawsuits between them.  In 1986, litigation arose between Tony and Robert over one share of CRC stock owned by their mother.[3]  They eventually settled this dispute by agreeing to split their mother's share of stock equally.  As part of the settlement, Tony agreed to allow Robert, upon notification, to buy at net book value Tony's shares in CRC and his interests in the joint ventures, or else to allow Robert to cause CRC to redeem Tony's shares.

On December 31, 1991, Robert sought to exercise his right to buy out Tony's interests in the joint ventures and to cause CRC to redeem Tony's shares.  Litigation ensued between Tony and Robert over, among other things, the value of Tony's CRC shares.  After much legal wrangling, Tony and Robert agreed to hire an independent accounting firm, Kolb Lauwasser, to calculate the value of the shares.  Based on its review, Kolb Lauwasser valued Tony's CRC shares at approximately $166,000.

In October 1992, Tony and Robert settled the lawsuit over the joint venture buyout and stock redemption.  Pursuant to the settlement, Tony agreed to relinquish his interests in both CRC and the joint ventures.  In consideration of the CRC stock, Tony

_____

[3] Because Tony Zidar and Robert Zidar were equal shareholders in Concrete Raising Corp. (CRC), ownership by either Tony or Robert of the one share of CRC stock held by their mother would give the owner a controlling interest in CRC.

received $50,000 and forgiveness of his $116,831 indebtedness to CRC.[4]

For 1992, CRC issued Tony a Form 1099-MISC, Miscellaneous Income (the Form 1099), reporting a $166,831 payment. Petitioners claim not to have received a copy of the Form 1099.

Tony's Stock Car Activity

In the late 1960's, Tony became involved in automobile racing, first by working on pit crews and later by participating in stock car racing as a hobby. In the early 1980's, he and Robert purchased an automobile racetrack located in the city of Oregon, Wisconsin, and ran it for a couple of years.

In 1991, Tony remortgaged his house for $50,000 to finance construction of a stock car for asphalt automobile racing. His goal was to have a stock car ready for racing in the American Speed Association's (ASA's) 1992 racing season. During 1992, Tony had a stock car (the stock car) built to ASA standards, hiring an Illinois contractor to build a body for the Oldsmobile chassis and a Wisconsin contractor to install the parts.

---

[4] On their 1992 Federal income tax return, petitioners reported a sale price of $800,000 for the joint ventures. Petitioners reported the transaction as an installment sale, showing that in 1992 they received $699,925 of the total $800,000 sale price and that they had realized $73,894 of capital gains in 1992 under the installment method. Respondent has raised no issue regarding petitioners' income tax reporting of Tony's sale of his interests in the joint ventures.

Over 6 to 8 months in 1992, while the stock car was being built, Tony spent approximately 100 to 300 hours on his stock car activity. During the same period, he worked full-time for CRC, never missing a day of work. In 1992, construction of the stock car was completed. Tony garaged the car at his house. Although he spoke with some potential drivers, none signed a contract to drive the stock car for him.

To make a profit from his stock car activity, Tony needed to obtain large sponsors. He could not rely on prize winnings to make a profit, because drivers take a significant portion of any prize winnings. In 1992, Tony was able to obtain no more than $5,571 in sponsorships. After other sponsorships failed to materialize, Tony decided to sell the stock car, without ever having raced it. Tony advertised the stock car for sale in trade magazines.

Hoping that a good showing in a race would make the stock car more attractive to a purchaser, in the fall of 1992 Tony entered it in a race at a Madison, North Carolina, speedway. While the stock car was being driven around the speedway between qualifying runs for the race, it collided with another race car and was destroyed. Tony's stock car was uninsured, and he did not replace it.

Petitioners spent over $100,000 on the stock car activity. Tony had no business plan for his stock car activity, nor did he

speak with any consultants about how to operate a profitable stock car business.

## Petitioners' Federal Income Tax Return

On their 1992 joint Federal income tax return, petitioners reported a sale price of $159,100 for Tony's CRC shares, basis in the shares of $109,100, and net capital gain of $50,000. With regard to Tony's stock car activity, petitioners claimed on their Schedule C, Profit or Loss From Business (Sole Proprietorship), $5,571 in gross income and $71,692 in expenses, resulting in a net loss of $66,121.[5] Petitioners also reported wage income of $51,931 from CRC.

John P. Hayes, Esq. (Hayes), prepared petitioners' 1992 Federal income tax return.[6] Either Tony or one of his agents provided Hayes all the information that he used to prepare petitioners' tax return.

## Respondent's Examination and Determinations

While auditing petitioners' 1992 Federal income tax return, respondent's agent contacted CRC's accountants, Conley, McDonald & Sprague, and requested supporting documentation for the

---

[5] In 1991, which was the first year that petitioners treated Tony's stock car activity as a trade or business for Federal income tax purposes, petitioners reported gross income from this activity of $6,430 and losses of $57,135.

[6] Although John P. Hayes, Esq., prepared petitioners' 1992 Federal income tax return, he did not sign the return as the "preparer".

$166,831 reported on the Form 1099 as income paid by CRC to Tony. Conley, McDonald & Sprague provided the agent with summary sheets (created by Conley, McDonald & Sprague from CRC's records) describing the manner in which the income reported on the Form 1099 was calculated. On the basis of this investigation, respondent determined that, consistent with the information reported on the Form 1099, CRC had redeemed Tony's shares for $166,831, representing a cash payment of $50,000 plus discharge of all Tony's obligations to CRC, totaling $116,831. Moreover, respondent determined that petitioners had failed to substantiate any basis in the CRC stock. Consequently, in the notice of deficiency, respondent determined that petitioners must recognize $166,831 of capital gain from Tony's disposition of his CRC shares and accordingly increased petitioners' taxable income by $116,831 ($166,831 less the $50,000 capital gain that petitioners reported on their 1992 return).

In addition, respondent determined that Tony did not engage in his stock car activity for profit. Respondent limited petitioners' claimed deductions from this activity to $5,571, which was the gross income that petitioners reported therefrom.

OPINION

A.  Capital Gain From Stock Redemption

The parties disagree as to whether petitioners recognized $50,000 in capital gains from CRC's redemption of Tony's stock,

as petitioners reported on their 1992 Federal income tax return, or $166,831, as respondent determined in the notice of deficiency. Resolution of this issue depends upon (1) the amount petitioners realized from the stock redemption and (2) the amount of petitioners' basis, if any, in the stock. Cf. sec. 1001(a).

In their petition, petitioners make no reference to respondent's disallowance of petitioners' claimed $109,100 basis in the CRC shares, nor have petitioners addressed this determination at trial or on brief. Petitioners have offered no evidence to substantiate any basis in the CRC shares. Consequently, we conclude that petitioners have conceded that they had no basis in the CRC shares, and we confine our consideration to the amount petitioners realized from the stock redemption.

Respondent contends that, as reflected on the Form 1099, CRC paid Tony $166,831 for his redeemed stock. At trial and on brief, petitioners argue that the Form 1099 was erroneous and that CRC paid Tony only $50,000 cash for his redeemed stock. In making this argument, petitioners seem oblivious to the fact that on their 1992 Federal income tax return, they reported the sale price of the CRC stock as $159,100.

Relying on Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68, petitioners contend that respondent's determination they received

$166,831 for the stock redemption was based solely on the Form 1099 issued by CRC and therefore is entitled to no presumption of correctness. Petitioners' argument is without merit. This is not a case where respondent determined a deficiency based solely on an employer's Form 1099. Rather, respondent's agent investigated the information that CRC reported on the Form 1099 and determined the extent to which it was supported by CRC's books and records, as summarized by CRC's accountants. This investigation provided a rational foundation for respondent's determination that petitioners received $166,831 for the redemption of Tony's CRC stock. The burden remains on petitioners to rebut the presumption of correctness of respondent's determination. See Rule 142(a); Pittman v. Commissioner, 100 F.3d 1308, 1316 (7th Cir. 1996), affg. T.C. Memo. 1995-243.

In contending that Tony received only $50,000 cash for the CRC stock redemption, petitioners maintain that CRC discharged no indebtedness of Tony's because Tony owed CRC nothing. Petitioners contend that Tony received no advances from CRC and that Robert altered CRC's books to reflect Tony's alleged corporate debt. The evidence does not support petitioners' contention, which, as previously discussed, seems inconsistent with their reporting on their 1992 Federal income tax return a $159,100 sale price for the CRC stock. A former employee of Conley, McDonald & Sprague

testified that she visited CRC once or twice a week, reviewed CRC's records, and recorded any shareholder advances taken by Tony or Robert. Respondent placed in evidence summary sheets prepared by Conley, McDonald & Sprague, which reflect the amounts Tony owed on his shareholder account. These sheets indicate that when Tony's CRC shares were redeemed, Tony owed CRC $116,831.

Other than Tony's bald insinuation of impropriety in CRC's record keeping, petitioners have given us no reason to doubt the validity of Conley, McDonald & Sprague's summary sheets. We found Tony's testimony to be vague, uncorroborated, and conclusory in certain material respects. Under these circumstances, we are not required to, and we do not, accept Tony's testimony. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

In sum, the evidence establishes that petitioners realized $166,831 from Tony's disposition of his CRC stock. Petitioners have failed to establish any basis in the stock. Accordingly, we conclude that they had a $166,831 capital gain from the stock redemption, and we sustain respondent's determination that petitioners underreported their capital gains by $116,831.

B. Tony's Stock Car Activity

Under section 183(b)(2), if an individual engages in an activity not for profit, deductions relating thereto are

allowable only to the extent gross income derived from the activity exceeds deductions that would be allowable under section 183(b)(1) without regard to whether the activity constitutes a for-profit activity. See Allen v. Commissioner, 72 T.C. 28, 32-33 (1979).

The taxpayer bears the burden of establishing that his or her activities were engaged in for profit. Rule 142(a). To carry this burden, the taxpayer must show that he or she had a "good faith expectation of profit". Burger v. Commissioner, 809 F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; see Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation, however, need not be reasonable. Burger v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Whether the taxpayer has the requisite profit motive is a question of fact, to be resolved on the basis of all relevant circumstances, with greater weight being given to objective factors than to mere statements of intent. Dreicer v. Commissioner, supra; Golanty v. Commissioner, supra at 426.

The regulations under section 183 provide a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. The factors include: (1) The

manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort the taxpayer expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs; see Golanty v. Commissioner, supra.

As discussed below, on the basis of all the evidence in the record, we conclude that Tony had no good faith expectation of making a profit from the stock car activity.

1. Manner of Carrying on Activity

Tony kept no regular books and records of his stock car activity. He had no business plan and made no predictions of income or expenses. He carried no insurance on his stock car. The record does not establish whether he had resources available to repair or replace the stock car.

To turn a profit on his stock car activity, Tony needed substantial funds from sponsors, since a significant share of any prize winnings would go to the driver. Tony hoped to secure large sponsorships. His testimony indicates that because he

rubbed shoulders with corporate executives at the race track, he thought he would be able to convince them to provide him sponsorships.  We are unpersuaded, however, that this was anything more than a false hope.  Large sponsorships never materialized.

We conclude that this factor weighs heavily against petitioners.[7]

### 2.  Expertise of Taxpayer or Advisers

In analyzing profit motive, a distinction must be drawn between expertise in the mechanics of an activity and expertise in the business, economic, and scientific practices relating to its conduct.  See Burger v. Commissioner, supra at 359; cf. sec. 1.183-2(b)(2), Income Tax Regs.  Although Tony had a longstanding interest in car racing, read car-racing magazines, owned a racetrack with Robert for a while, and had contacts with some mechanics and drivers, the record does not establish that Tony had any expertise in the economics or business of owning and racing a stock car.  There is no evidence that he studied accepted business practices of stock car racers or consulted with economic experts in the field.

This factor favors respondent.

---

[7] On reply brief, petitioners concede that "Tony is weak regarding this factor * * * Petitioners would admit that this factor weighs against them."

3.   Time and Effort Expended in Activity

Time and effort expended in carrying on an activity may be indicative of profit motive, particularly in the absence of substantial personal or recreational elements associated with the activity.  Sec. 1.183-2(b)(3), Income Tax Regs.  During 1992, Tony devoted 100 to 300 hours to his stock car activity.  We believe that this time expended is less indicative of a profit motive than of Tony's love of stock car racing.

A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may evidence a profit motive.  Id.  Tony testified that he reported to work at CRC every day while conducting his stock car activity.

This factor favors respondent.

4.   Expectation That Assets May Appreciate in Value

On reply brief, petitioners concede that they did not expect Tony's stock car to appreciate in value.

5.   Taxpayer's Success in Other Activities

If the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises, this circumstance may indicate that the activity in question was entered into for profit, even though it is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  Although Tony had been involved with automobile racing since 1968, the evidence does not indicate that his previous involvement was for profit or profitable.  Although Tony and Robert once owned a

racetrack, the evidence does not show whether this was a successful enterprise or explain why Tony quit it after a short while.

We conclude that this factor is neutral.

6.  <u>History of Income or Losses From Activity</u>

Tony never raced the stock car (apart from the ill-fated qualifying round), received no cash prizes, and obtained only minimal sponsorships.  Petitioners spent, however, more than $100,000 on the stock car.  Given that Tony was unable to obtain the sponsorships necessary to make the activity profitable, we see no possibility that Tony could recoup his expenditures.

This factor favors respondent.

7.  <u>Amount of Occasional Profits Earned, if Any</u>

The amount and frequency of occasional profits earned from the activity may be indicative of a profit objective.  Sec. 1.183-2(b)(7), Income Tax Regs.  Apart from nominal sponsorships, Tony's stock car activity generated no positive cashflows, much less profits.  The "opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated."  <u>Id.</u>  Although Tony's activity was a "highly speculative venture", we are unpersuaded that he ever had an opportunity to earn a substantial ultimate profit.  Although Tony presumably wanted to win races, "a desire to win prize money is

not the equivalent of the actual and honest objective of earning a profit." Riddle v. Commissioner, T.C. Memo. 1994-133. Moreover, Tony could not earn a substantial profit without securing large sponsors, which he failed to do.

This factor favors respondent.

8.    Taxpayer's Financial Status

Substantial income from sources other than the activity may indicate the lack of a profit motive, particularly if (1) losses from the activity generate substantial tax benefits, and (2) personal or recreational elements are involved.  Sec. 1.183-2(b)(8), Income Tax Regs.

Tony had substantial income from CRC and his commercial real estate ventures.  In 1992, Tony received $50,000 in cash consideration of his interests in CRC and reported receiving $699,925 from the sale of the joint ventures, as well as wage income of $51,931 from CRC.  As previously discussed, there were strong personal and recreational elements to Tony's stock car activity.

This factor favors respondent.

9.    Elements of Personal Pleasure

Elements of personal pleasure or recreation may signal the absence of a profit motive.  Sec. 1.183-2(b)(9), Income Tax Regs. The evidence clearly shows that Tony enjoyed and obtained

pleasure from his stock car activity.  This factor favors respondent.

Petitioners place great reliance on the case of Mills v. United States, 699 F. Supp. 1245 (N.D. Ohio 1988), which held that a taxpayer's motorcycle racing activity qualified as a trade or business.  Unlike the taxpayer in Mills, however, Tony had no separate bank account for his stock car activity, retained no business and financial adviser to aid him in his racing activities, participated in no special exhibitions to attract financial sponsorship of large companies, and never actually raced his vehicle (except in the ill-fated qualifying round).

On the basis of all the evidence, we conclude that petitioners have failed to demonstrate that Tony entered into the stock car activity with a good faith expectation of making a profit.  Accordingly, we sustain respondent's determination on this issue.

C.   Accuracy-Related Penalty Pursuant to Section 6662(a)

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662.  Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment that is attributable to, among other things, negligence or disregard of the rules or regulations or any substantial understatement of income tax.  Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person

would do under the same circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934 (1985).

No penalty shall be imposed under section 6662(a) with respect to any portion of an underpayment if it is shown that there was reasonable cause and that the taxpayer acted in good faith. Sec. 6664(c). Whether a taxpayer acted with good faith depends upon the facts and circumstances of each case. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a professional tax adviser or return preparer constitutes reasonable cause and is in good faith if the taxpayer establishes, among other things, that the taxpayer provided the adviser or return preparer with the necessary and accurate information. <u>Neonatology Associates P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000). If the taxpayer fails to provide the adviser or return preparer with the information necessary for preparing the return, the taxpayer may be liable for the penalty. <u>Johnson v. Commissioner</u>, 74 T.C. 89, 97 (1980), affd. 673 F.2d 262 (9th Cir. 1982).

We have found that petitioners underreported their capital gain on the redemption of Tony's CRC stock by $116,831. They have offered no explanation for the $159,100 sale price reported on their 1992 Federal income tax return--an amount less than the $166,831 that CRC reported on the Form 1099--or the $109,100 basis they claimed for the CRC stock. Petitioners claimed net

losses of \$66,121 from a stock car activity that from all indications was predominantly for Tony's pleasure and recreation.

Petitioners contend that no penalty should apply because they relied upon Hayes to draft their 1992 Federal income tax return. Petitioners failed to prove that they provided Hayes with complete information for preparing their 1992 return.

In a letter to Tony dated March 7, 1994, Hayes noted that all information used to prepare the return came from either Tony or one of Tony's agents. Although Tony received monthly, quarterly, and annual statements reflecting the balance on his CRC shareholder account, there is no evidence that petitioners shared the information contained in these statements with Hayes.

In his March 7, 1994, letter, Hayes also stated that the reported loss relating to Tony's stock car activity "is large and will probably be subject to audit. It was reported on your return upon your assurance that the racing venture was entered into with the purpose of obtaining a profit". From this disclaimer, it appears that Hayes was relying on petitioners' judgment, rather than the other way around.

Petitioners have not established that they acted in good faith and had reasonable cause in understating their capital gains from the CRC stock redemption or in claiming the losses relating to the stock car activity. We sustain respondent's determination on this issue.

To reflect the foregoing,

Decision will be entered

for respondent.